STATE OF NORTH CAROLINA v. MITCHELL DAVID HOLMES

No. 7A01

(Filed 28 June 2002)

## 1. Homicide— first-degree murder—short-form indictment—constitutionality

The trial court did not err by concluding that the short-form indictment used to charge defendant with first-degree murder was constitutional even though it did not allege that the murder was committed either in the course of a felony or with premeditation and deliberation.

## 2. Criminal Law— shackling of defendant's legs—reasonably necessary

The trial court did not abuse its discretion in a first-degree murder, attempted first-degree murder, and robbery with a dangerous weapon case by ordering over defendant's objection that defendant remain shackled by the legs during the trial, because: (1) records showed that defendant had numerous instances of

misconduct while in jail awaiting trial; (2) immediately prior to trial, defendant began fighting with officers when defendant discovered that contraband in his possession had been confiscated; (3) such restraint was reasonably necessary to maintain order and to provide for the safety of persons; (4) defendant's past disregard for order and the safety of others while in custody is a reasonable indicator that defendant may exhibit the same conduct during trial; (5) an incident requiring six people to forcefully subdue defendant occurred a mere twelve days prior to the hearing in question; (6) the trial court considered the factors listed in the Tolley case; (7) the leg shackles were not visible to the jury; and (8) defendant cites to nothing in the record suggesting that defendant was impaired by the restraint, and the trial court indicated that the initial ruling would be reconsidered on a daily basis.

**3. Evidence— expert testimony—whether ammunition caused injuries**

The trial court did not err in a first-degree murder, attempted first-degree murder, and robbery with a dangerous weapon case by overruling defendant's objection to testimony from the State's firearm analysis and identification expert regarding whether the ammunition he examined could have caused the murder victim's injuries, because even assuming arguendo that the pertinent portion of the testimony constituted medical testimony that was outside the expert's field of expertise, any error was harmless when: (1) the undisputed evidence showed that the shots that killed one victim and injured another were fired from a rifle; (2) the alleged improper testimony served to establish only that the rifle was the weapon that caused the injuries and in no way did the testimony imply that defendant was the man who fired the rifle; and (3) defendant cannot show that there is a reasonable possibility that a different result would have been reached at trial absent this testimony.

**4. Evidence— double hearsay—admission of statement harmless error**

Although defendant contends the trial court violated his right of confrontation in a first-degree murder and attempted first-degree murder sentencing proceeding by overruling defendant's objection to an SBI agent's double-hearsay testimony that one coparticipant told the agent that another coparticipant said defendant was the shooter, any alleged violation was harmless

STATE v. HOLMES

[355 N.C. 719 (2002)]

because: (1) the jury had already determined beyond a reasonable doubt during the guilt-innocence phase that defendant fired the rifle; (2) the jury had earlier heard similar testimony; and (3) no reasonable probability exists that this double-hearsay statement affected the outcome of the sentencing proceeding.

**5. Sentencing— capital—mitigating circumstances—minor participation—refusal to submit—premediation and deliberation—insufficient additional evidence at sentencing— harmless error**

The trial court's ruling that it would not submit the mitigating circumstance that "the murder was actually committed by another person" was in effect a refusal to submit the statutory mitigating circumstance that "defendant was an accomplice in or accessory to the capital felony committed by another person and his participation was relatively minor," N.C.G.S. 15A-2000(f)(4). The trial court did not err by refusing to submit the (f)(4) mitigating circumstance because (1) it was held in *State v. Roseboro,* 351 N.C. 536 (2000) that this circumstance is inapplicable where the defendant was convicted of premeditated and deliberate murder and (2) even if the Court were to hold that the *Roseboro* rule did not apply where additional evidence was presented at the sentencing hearing, defendant's own statement introduced at sentencing showed that his participation was not minor. Furthermore, any error in the trial court's refusal to submit the (f)(4) mitigating circumstance was harmless because, in finding defendant guilty of premeditation and deliberation, the jury found beyond a reasonable doubt that defendant fired a rifle at the victim, and a reasonable probability did not exist that defendant's additional evidence consisting of a self-serving statement would be sufficient to change a juror's mind as to who shot the rifle.

**6. Sentencing— capital—mitigating circumstances—initial idea by coparticipant—amendment by trial court**

In a capital sentencing proceeding for a first-degree murder committed during a robbery, defendant's proposed nonstatutory mitigating circumstance that the initial idea that resulted in the victim's death was a coparticipant's was properly amended by the trial court to state that the initial idea for the robbery was the coparticipant's in order to avoid a misinterpretation by the jury unsupported by substantial evidence.

**7. Sentencing— capital—aggravating circumstances—murder committed during robbery—murder part of a course of conduct—no double counting of evidence**

The trial court in a capital sentencing proceeding for a first-degree murder did not improperly allow the jury to use the same evidence that someone went through an attempted murder victim's pockets to support the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that the murder was committed during a robbery and the N.C.G.S. § 15A-2000(e)(11) aggravating circumstance that the murder was part of a course of conduct, because: (1) the robbery supported the (e)(5) aggravating circumstance while the attempted murder supported the (e)(11) aggravating circumstance; (2) defendant did not properly request a limiting instruction since he only made an oral request and N.C.G.S. § 15A-1231 provides a party may tender written instructions; and (3) even assuming error arguendo, defendant cannot show a reasonable possibility that a different result would have been reached absent this error.

**8. Sentencing— mitigating circumstances—failure to appreciate criminality of conduct**

The trial court did not err in a first-degree murder capital sentencing proceeding by failing to submit the N.C.G.S. § 15A-2000(f)(6) mitigating circumstance that defendant did not appreciate the criminality of his conduct or could not conform his conduct to the requirements of law because contrary to defendant's assertions, an expert's testimony that defendant operated under a mental or emotional disturbance at the time of the murder does not show that defendant's ability to appreciate the criminality of his actions or to conform his conduct to the law was impaired, but instead was properly considered under the N.C.G.S. § 15A-2000(f)(2) mitigating circumstance that the murder was committed while defendant was under the influence of a mental or emotional disturbance.

**9. Sentencing— death penalty—not disproportionate**

The trial court did not err in a first-degree murder case by sentencing defendant to the death penalty, because: (1) defendant was convicted on the basis of premeditation and deliberation and the felony murder rule; (2) a murder in the home shocks the conscience, and defendant shot the victim in the victim's home; and (3) the jury found the three aggravating cir-

cumstances under N.C.G.S. § 15A-2000(e)(3), (e)(5), and (e)(11), all of which standing alone have been held sufficient to support the death penalty.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Thompson, J., on 8 September 2000 in Superior Court, Johnston County, upon a jury verdict finding defendant guilty of first-degree murder. On 31 July 2001, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of an additional judgment. Heard in the Supreme Court 14 February 2002.

*Roy Cooper, Attorney General, by Teresa H. Pell, Special Deputy Attorney General, for the State.*

*Staples Hughes, Appellate Defender, by Charlesena Elliott Walker, Assistant Appellate Defender, for defendant-appellant.*

PARKER, Justice.

Defendant Mitchell David Holmes was indicted on 15 February 1999 for the first-degree murder of Dean Ray Creech, the attempted first-degree murder of Ronnie Lynn Hardison, and robbery with a dangerous weapon. Defendant was tried capitally and found guilty of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. He was also found guilty of attempted first-degree murder and of robbery with a firearm. Following a capital sentencing proceeding, the jury recommended a sentence of death for the murder conviction; and the trial court entered judgment accordingly. The trial court also sentenced defendant to a term of 220 to 273 months' imprisonment for the attempted first-degree murder conviction and arrested judgment on the robbery with a firearm conviction as it was the underlying felony for the felony murder conviction.

The State's evidence tended to show that on the evening of 14 January 1999, Jerry Bland and Hardison visited Creech at his trailer in Selma, North Carolina. When the men arrived, they saw a black man wearing a hooded jacket exiting the trailer. Less than an hour later, the same man returned to the trailer, went with Creech into the master bedroom, and again departed. Sometime later, someone knocked on the trailer door; in response, Creech went outside and returned with a small bag of cocaine. Bland and Creech used syringes to inject the cocaine while Hardison "snorted some."

Inside Creech's trailer that night there was an old 12-gauge shotgun in the corner of the living room and a .44 magnum pistol lying on the back of the couch. At Creech's request, Bland determined that the shotgun had no firing pin and was, therefore, inoperable. These guns were later stolen by defendant and his accomplice. At some point during the evening, Creech brought a black bag containing smaller freezer bags filled with marijuana into the living room to show Hardison and Bland.

A short time later, Bland went to the back bathroom to take a shower. While Bland was in the bathroom, someone knocked on the front door of the trailer and called out a name. Hardison testified that when Creech opened the door, defendant, holding a rifle, and another man barged into the trailer and began shouting, wanting to know where the marijuana was located. Defendant pulled back the bolt on the rifle and shot Creech twice. Upon seeing defendant shoot Creech, Hardison turned to flee toward the back of the trailer. After Hardison moved two or three feet, defendant shot him in the back. The shot knocked Hardison down, and he lost feeling in his leg; Hardison then "just laid there" silently, "reckon[ing] they figured I was dead too." Hardison heard the second man ask defendant, "Why did you shoot him?" Defendant indicated that they should quickly attempt to locate the marijuana, as Creech's neighbors likely heard the gunshots. Hardison heard the men rummaging through the trailer, opening cabinet doors, and running around. At one point, one of the men went through Hardison's pockets while Hardison lay on the floor, though they did not locate any money.

Bland was in the bathroom when the incident began. He heard a knock on the front door, then heard the door slam open and a man screaming, "Where's the weed? Where's the money?" several times. Upon hearing the gunshots, Bland lay down in the bathtub and pulled the shower curtain closed. Bland heard the men ransacking the trailer, then, when everything was quiet, heard Hardison yell, "Jerry [Bland], I've been shot. Come help me. I've been shot. I think I'm dying." Bland went to Hardison's aid and found him standing at the bar, holding his abdomen, from which his intestines were protruding. Bland saw Creech, curled up on his side against the wall, not moving and with a lot of blood around his chest. Bland determined that Creech did not have a pulse, then called 911. Pursuant to the 911 operator's request, Bland moved Creech's body flat on the floor and began performing CPR. While Bland was performing mouth-to-mouth resuscitation, "massive bubbles" began coming out of Creech's chest.

Shortly after Bland began performing CPR, officers and paramedics arrived at the scene and determined that Creech was dead.

Gonzalo Santiago testified that around 11:00 or 11:30 that night he and Shantawn Freeman went to a convenience store to buy beer. While at the store, Santiago saw defendant and Michael Frazier; he was acquainted with both men. Frazier approached Santiago and Freeman and told them that he wanted to gather a group to rob some men in Wilson Mills of six pounds of marijuana. Santiago declined the offer, but Freeman agreed to participate. Santiago and Freeman then drove back to Santiago's home, with defendant and Frazier following in their own car. Freeman spoke with defendant and Frazier again at Santiago's home, then defendant, Freeman, and Frazier left together for Wilson Mills, with defendant driving the car, to commit the armed robbery. About one and a half to two hours later, defendant and Freeman returned to Santiago's home. Santiago noticed that defendant and Freeman looked shocked, "like something major just happened." Defendant stated, "I shot him." Santiago looked at Freeman in disbelief; and Freeman nodded, stating, "He shot him. He shot him." Defendant then drove away, while Freeman stayed and told Santiago what had occurred.

The pathologist who performed the autopsy on Creech's body discovered two gunshot wounds but was unable to determine the order in which the wounds were inflicted. The first wound the pathologist described was caused by a bullet that entered the right side of the chest; traveled through the right lung; traveled through the aorta, causing an accumulation of blood around the heart; and created a large, irregular exit wound on the upper left side of the chest. The second wound the pathologist described was caused by a bullet that entered the left lower back; went through the left lung; and exited the left side of the chest, with fragments lodging in the left arm. The pathologist testified that the first bullet was fired from a distance of greater than two feet by a high-velocity weapon. The pathologist opined that either wound alone would have been fatal and that Creech died as a result of these wounds.

Agents investigating the crime scene discovered a large black plastic bag under a pile of clothes in the master bedroom. Inside this large bag were numerous smaller bags containing a total of approximately three and one half pounds of marijuana. Investigators also discovered that one of the bullets that killed Creech subsequently went through the front wall of the trailer and struck a car in the front yard. The bullet that injured Hardison subsequently traveled down the hall-

way before going through a dresser and a wall, crossing an open field, and lodging in the opposite wall of a barn. Spent .30-caliber bullet casings were found beside Creech's body, below the hole in the front wall, and on the sofa. A firearms expert determined that the bullet found in the barn, the lead fragments taken from Creech's body, and the three fired cartridges found in the trailer were consistent in caliber, design, and manufacture. Furthermore, the bullet found in the barn and the bullet fragments recovered from Creech's body were fired from the same weapon. Likewise, the fired cartridges were all fired from the same weapon. The expert further opined that the casings and the bullets could have been fired from the same weapon.

On 25 January 1999 investigators showed Hardison a photographic array of suspects. Hardison conclusively picked defendant out of the lineup as one of the perpetrators and was "ninety percent sure" that defendant was the man with the gun. On 17 January 1999 Frazier told investigators, among other things, that he was the black man that Hardison and Bland had seen on two occasions at the trailer on the night of the murder. As a result of the interview with Frazier, arrest warrants were issued for defendant and Freeman. Defendant was arrested on 18 January 1999 after being seen driving his girlfriend's car. A search of the car revealed a pair of defendant's blue jeans with a bloodstain on the knee. Later DNA testing showed that it was Creech's blood on the blue jeans.

At sentencing defendant presented testimony from numerous witnesses, including testimony from Agent Greg Tart of the State Bureau of Investigation that defendant admitted in an interview on 18 January 1999 that he went to Creech's house with Frazier and Freeman at Frazier's suggestion. According to defendant's statement, read in open court by Agent Tart, Freeman shot Creech and Hardison, then stole the pistol and shotgun from the trailer.

Additional facts will be presented as necessary to discuss specific issues.

## JURISDICTIONAL ISSUE

**[1]** Defendant contends that the short-form murder indictment was insufficient to charge him with first-degree murder as it did not allege that the murder was committed either in the course of a felony or with premeditation and deliberation. Thus, defendant argues, use of the short-form murder indictment for first-degree murder violates defendant's rights under the Fifth, Sixth, and Fourteenth

Amendments to the United States Constitution and Article I, Sections 19 and 23 of the North Carolina Constitution. Furthermore, defendant contends that such use of the short-form murder indictment directly contravenes two recent United States Supreme Court cases. *See Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311 (1999); *Almendarez-Torres v. United States*, 523 U.S. 224, 140 L. Ed. 2d 350 (1998). As defendant concedes, however, this Court has previously ruled against defendant's position on this issue. *See, e.g., State v. Mitchell*, 353 N.C. 309, 543 S.E.2d 830, *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 389 (2001); *State v. Holman*, 353 N.C. 174, 540 S.E.2d 18 (2000), *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 181 (2001); *State v. Golphin*, 352 N.C. 364, 533 S.E.2d 168 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001); *State v. Braxton*, 352 N.C. 158, 531 S.E.2d 428 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001). Defendant has presented no compelling reason why this Court should reexamine this issue, and we therefore overrule this assignment of error.

## PRETRIAL ISSUE

[2] Defendant contends that the trial court erred in ordering, over defendant's objection, that defendant "remain shackled by the legs, which are not visible to the public or to the jurors who happen to be in the courtroom, and that that not be exposed by any manner to the jury or prospective jurors" during the trial. This error, defendant contends, violated defendant's federal and state constitutional rights to due process and a fair trial, as the restraint was not reasonably necessary. As defendant did not rely on constitutional grounds at trial, we address only whether the trial court abused its discretion in ordering that defendant be restrained. *See State v. Benson*, 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988) (" 'a constitutional question which is not raised and passed upon in the trial court will not ordinarily be considered on appeal' ") (quoting *State v. Hunter*, 305 N.C. 106, 112, 286 S.E.2d 535, 539 (1982)).

This Court has stated that

shackling of the defendant should be avoided because (1) it may interfere with the defendant's thought processes and ease of communication with counsel, (2) it intrinsically gives affront to the dignity of the trial process, and most importantly, (3) it tends to create prejudice in the minds of the jurors by suggesting that the defendant is an obviously bad and dangerous person whose guilt is a foregone conclusion.

*State v. Tolley*, 290 N.C. 349, 366, 226 S.E.2d 353, 367 (1976). Despite these concerns, a trial judge

> may order a defendant or witness subjected to physical restraint in the courtroom when the judge finds the restraint to be reasonably necessary to maintain order, prevent the defendant's escape, or provide for the safety of persons.

N.C.G.S. § 15A-1031 (2001). The factors that a trial judge may consider in making this determination include, *inter alia*,

> the seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

*Tolley*, 290 N.C. at 368, 226 S.E.2d at 368.

Frank Gunter, a detention center administrator, testified that records showed that defendant had numerous instances of misconduct while in jail awaiting trial. These incidents included: refusing to return to his cell on several occasions, using obscene language on more than one occasion, giving prescription medication to another inmate, assaulting another inmate, threatening to start a fire in his cell, refusing to permit the food pass door in the cell to be closed, threatening corrections officers on more than one occasion, attempting to start a fire in his cell block, refusing to be handcuffed, being uncooperative and profane, fighting and refusing orders to desist, and tampering with the cell door locking mechanism. Gunter further testified that, while in the detention center immediately prior to trial, defendant began fighting with officers when he discovered that contraband in his possession had been confiscated. Ultimately, it took four sheriff's deputies and two detention center staff members to subdue defendant and place him in his cell. Gunter also testified that defendant repeatedly jammed the lock to his cell door while at the detention center.

The trial court ruled that

> Defendant has participated in a number of disciplinary problems, including assaultive behavior, failure to follow rules, and other

matters . . . . In order to avoid a possible problem of similar conduct in the courtroom, I am going to initially order that the Defendant is to remain shackled by the legs, which are not visible to the public or to the jurors who happen to be in the courtroom, and that that not be exposed by any manner to the jury or prospective jurors.

In light of defendant's disruptive and assaultive behavior, we conclude that the trial court acted within its discretion to order defendant's restraint. The record shows that such restraint was reasonably necessary to maintain order and to provide for the safety of persons. The Court is not persuaded by defendant's argument that the trial court erred, as the testimony before it related only to defendant's previous conduct rather than to evidence that defendant was a threat to safety or decorum at the time of the trial. Defendant's past disregard for order and the safety of others while in custody is a reasonable indicator that defendant may exhibit the same conduct during trial. We also note that the incident requiring six people to forcefully subdue defendant occurred a mere twelve days prior to the hearing in question.

Defendant further argues that the trial court erred by not considering all of the factors listed in *Tolley*. However, *Tolley* sets out neither a complete enumeration of factors that a judge may consider nor a checklist of factors that the trial court must consider and balance. *See id.* (noting that the factors listed "may" be considered and are "*inter alia*"). The record shows that the trial court properly considered factors allowed under both the statute and this Court's ruling in *Tolley* and that these factors were sufficient for the trial court to determine, within its discretion, that restraint was reasonably necessary.

We further note that the record discloses that the leg shackles were not visible to the jury. Thus, the risk is negligible that the restraint undermined the dignity of the trial process or created prejudice in the minds of the jurors by suggesting that defendant is a dangerous person. *See State v. Wilson*, 354 N.C. 493, 521, 556 S.E.2d 272, 290 (2001). Defendant argues that the shackles "likely adversely affected [defendant's] mental and emotional state and lessened his ability to understand his legal proceedings, communicate with his counsel and assist in his own defense." However, defendant cites to nothing in the record suggesting that defendant was so impaired by the restraint. The trial court clearly indicated that the initial ruling

would be reconsidered on a daily basis; hence, trial counsel could have brought any impairment caused by the restraint, had it existed, to the trial court's attention at any point during the trial.

For the above reasons, we hold that the trial court did not abuse its discretion in ordering defendant restrained during the trial and overrule this assignment of error.

## GUILT-INNOCENCE PHASE

[3] In his only assignment of error relating to the guilt-innocence phase of his trial, defendant argues that the trial court erred in overruling his objection to testimony from the State's firearm analysis and identification expert, Agent Thomas Trochum of the State Bureau of Investigation, regarding whether the ammunition he examined could have caused Creech's injuries. Defendant contends that this testimony was outside the expert's area of expertise and, therefore, violated the North Carolina Rules of Evidence as well as defendant's constitutional rights to due process and a fair trial. We note initially that defendant did not object to this testimony on constitutional grounds at trial. Therefore, we decline to address defendant's constitutional claims on appeal. *See Benson*, 323 N.C. at 322, 372 S.E.2d at 519.

Under the North Carolina Rules of Evidence,

[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education[] may testify thereto in the form of an opinion.

N.C.G.S. § 8C-1, Rule 702(a) (2001). Subsequent to testimony regarding Trochum's extensive experience and education, the trial court received him, without objection by defendant, as "an expert in the field of firearm analysis and identification." Trochum thereafter testified, again without objection from defendant, that the bullet located in the barn and the fragments taken from Creech's body were fired from one weapon and that the three fired cartridges found in Creech's trailer were fired from one weapon. Although he could not determine whether the weapon that fired the bullets was the same weapon that expended the cartridges or whether the bullets came from those cartridges, Trochum noted that the bullets and the cartridges were consistent in caliber, design, and manufacture and could have been fired from the same firearm. Trochum also described the mass and veloc-

ity of this ammunition, concluding that such bullets are "excellent penetrators."

Following this testimony, the following exchange occurred:

[PROSECUTOR]: Based on your training and experience, are you familiar with the type of damage that this particular type of ammunition may cause to the human body?

[DEFENSE COUNSEL]: I would object to that, Your Honor.

THE COURT: Objection is overruled.

[AGENT TROCHUM]: Yes, sir.

. . . .

[PROSECUTOR]: I'm now going to show you [the autopsy photographs]. Will you please examine these photographs and tell me whether or not the wounds that you observe there, whether or not you can form an opinion to a reasonable scientific certainty as to whether or not the ammunition that you examined could have caused that particular damage?

[DEFENSE COUNSEL]: I would object.

THE COURT: Overruled.

[AGENT TROCHUM]: These particular cartridges have the ability, of course. In [the first two photographs], you have what appears to be a small penetration here. Certainly that's capable of these particular bullets. In [the last two photographs], you have large wounds here. I would expect to see this from either a fragmenting gunshot, if they—

[DEFENSE COUNSEL]: Objection.

[AGENT TROCHUM]: —were caused by these particular bullets.

THE COURT: Overruled.

[AGENT TROCHUM]: This would—they are not incapable of this type of damage. Again, these are excellent penetrators.

Defendant argues that this quoted portion of the Agent Trochum's testimony constituted medical testimony that was outside his field of expertise.

Assuming *arguendo* that defendant is correct in characterizing the above testimony as outside the expert's field of expertise, any

error was harmless. The undisputed evidence showed that the shots that killed Creech and injured Hardison were fired from the rifle. The testimony showed that the only firearms present at the time were an inoperable shotgun, a .44 magnum pistol, and the rifle brought into the trailer by the perpetrators. No evidence suggests that the .44 magnum pistol was ever used, and all the physical evidence supports a finding that only a .30-caliber weapon was fired. Hardison's testimony further establishes that the only weapon fired during the incident was the rifle.

Defendant argues that, given the relatively weak evidence that defendant was the actual shooter, Agent Trochum's testimony prejudiced defendant by "suggest[ing] that [defendant], whom Hardison identified as the man carrying the bolt-like rifle in the trailer, fired the shots that seriously wounded [Hardison] and fatally wounded Creech." However, the allegedly improper testimony served to establish only that the rifle was the weapon that caused Creech's and Hardison's injuries, a fact already established by the undisputed evidence. In no way did the testimony in question imply that defendant was the man who fired the rifle. Thus, even if the testimony was improper, defendant cannot show that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a)(2001). Accordingly, we overrule this assignment of error.

## SENTENCING PROCEEDING

[4] By another assignment of error, defendant alleges that the trial court erred in overruling defendant's objection to SBI Agent Tart's double-hearsay testimony that Frazier told him that Freeman said defendant was the shooter. Defendant alleges that admission of this statement violated defendant's constitutional right of confrontation, as he was unable to cross-examine either Freeman or Frazier.

For their involvement in these crimes, Frazier was charged with conspiracy to commit robbery with a dangerous weapon; and Freeman was charged with murder, attempted murder, and robbery with a dangerous weapon. Neither Frazier nor Freeman testified at defendant's trial. During sentencing defendant called Agent Tart to the stand and elicited testimony regarding defendant's confession to the crime and assertion that Freeman was the shooter. On cross-examination, the following colloquy occurred:

[PROSECUTOR]: Agent Tart, prior to the Defendant making his statement, Michael Frazier had already made a statement to you, had he not?

[AGENT TART]: Yes.

[PROSECUTOR]: Is it not true that Michael Frazier told you that this Defendant was the one that shot Dean Creech?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

. . . .

[AGENT TART]: . . . I believe he told me that someone else told him that.

[PROSECUTOR]: That someone else being Shantwan Freeman; is that correct?

[AGENT TART]: Right.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

While the Rules of Evidence do not apply to a capital sentencing proceeding, *State v. Daughtry*, 340 N.C. 488, 517, 459 S.E.2d 747, 762 (1995), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996), the constitutional right to confront witnesses does apply, *State v. McLaughlin*, 341 N.C. 426, 458, 462 S.E.2d 1, 19 (1995) (holding that "[a]lthough the evidence at issue [at sentencing] was admissible as a matter of law under the statute, we must also address whether the admission of that [evidence] violated defendant's confrontation rights under the federal and state constitutions"), *cert. denied*, 516 U.S. 1133, 133 L. Ed. 2d 879 (1996).

The Confrontation Clause of the Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, affords criminal defendants the right " 'to be confronted with the witnesses against him.' " *State v. Jaynes*, 353 N.C. 534, 554, 549 S.E.2d 179, 195 (2001) (quoting U.S. Const. amend. VI). "The principal purpose of confrontation is to secure to the defendant the right to test the evidence of the witnesses against him through cross-examination." *State v. Mason*, 315 N.C. 724, 729, 340 S.E.2d 430, 434 (1986). Defendant in this case was denied the right to cross-examine the declarants, Freeman and Frazier, inasmuch as Freeman and Frazier

were also charged with crimes arising from these events. Thus, their right under the Fifth Amendment to the United States Constitution not to testify made them unavailable for cross-examination by defendant. *See Lilly v. Virginia*, 527 U.S. 116, 124, 144 L. Ed. 2d 117, 126 (1999). A defendant's mere lack of an opportunity to cross-examine a witness does not necessarily mean, however, that the defendant's confrontation rights were violated:

> When a court can be confident—as in the context of hearsay falling within a firmly rooted exception—that "the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility," the Sixth Amendment's residual "trustworthiness" test allows the admission of the declarant's statements.

*Lilly v. Virginia*, 527 U.S. 116, 136, 144 L. Ed. 2d 117, 134 (1999) (quoting *Idaho v. Wright*, 497 U.S. 805, 820, 111 L. Ed. 2d 638, 655 (1990)). Defendant argues that neither portion of the double-hearsay statement in question comports with any firmly rooted hearsay exception and has no other indicia of trustworthiness; hence, admission of the statement violated defendant's constitutional right to confront the witnesses against him.

Assuming *arguendo* that defendant is correct, any error is harmless beyond a reasonable doubt. Defendant was convicted at the guilt-innocence phase of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. Not having been instructed that it could find defendant guilty of premeditated murder under a theory of acting in concert with Freeman, by this verdict the jury necessarily determined that defendant himself fired the rifle.[1]

Moreover, the jury had already heard similar evidence without objection from defendant. Santiago testified during the guilt-innocence phase that Freeman said "[defendant] shot him. He shot him." Though this testimony occurred during the guilt-innocence phase, "all such evidence is competent for the jury's consideration in passing on punishment" as well. N.C.G.S. § 15A-2000(a)(3)(2001).

---

1. "When instructed on acting in concert, a jury may convict a defendant of premeditated and deliberate first-degree murder even though it does not believe the defendant personally committed the acts constituting the offense." *State v. Fletcher*, 354 N.C. 455, 473, 555 S.E.2d 534, 545 (2001). Thus, a finding of premeditated murder without being instructed on acting in concert requires the jury to find that defendant himself committed all the acts of murder, including firing the rifle.

Having heard this testimony, the jury was aware that Freeman's version of the events was that defendant was the shooter. Thus, the testimony that Freeman told Frazier, who in turn told Agent Tart, that defendant was the shooter was duplicative of evidence already before the jury.

Therefore, as the jury had already determined beyond a reasonable doubt that defendant fired the rifle and had earlier heard similar testimony, no reasonable probability exists that this double-hearsay statement affected the outcome of the sentencing proceeding. *See* N.C.G.S. § 15A-1443(b); *see also State v. Robinson*, 336 N.C. 78, 114, 443 S.E.2d 306, 323 (1994) (holding that the pertinent inquiry is whether the challenged error raises a reasonable probability that a different result would have been reached absent the error), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). Accordingly, this assignment of error is overruled.

**[5]** Defendant contends next that the trial court erred in failing to submit to the jury two nonstatutory mitigating circumstances supported by the evidence: (i) that the murder was actually committed by another person, and (ii) that the initial idea that resulted in the victim's death was Michael Frazier's. Although defendant asserts that as to the first circumstance the request was for a nonstatutory circumstance, the record on appeal fails to include defendant's list of proposed mitigating circumstances. Defendant quotes from the trial court's denial. Therefore, this Court cannot know whether the trial court's oral ruling quoted the requested instruction verbatim. Accordingly, we can only infer from the context of the transcript whether the requested instruction was for a statutory or nonstatutory mitigating circumstance.

The transcript shows that the trial court agreed to submit the mitigating circumstance that defendant had no significant history of prior criminal activity. The trial court then agreed to "give the instruction that this murder was committed while the Defendant was under the influence of mental or emotional disturbance." Immediately thereafter, the trial court addressed the circumstance in question, stating:

> I am not going to give the paragraph on that same page . . . which is whether the murder was actually committed by another person, with the Defendant being convicted of both premeditated and deliberated and felony murder. So I'm not giv-

ing the paragraph on that draft, which is paragraph four, I'm not giving that.

Addressing the next requested circumstance, the trial court stated, "I don't think there's any evidence that the capacity of the Defendant to appreciate the criminality of his conduct and conform his conduct to the requirements of the law was impaired." The trial court then agreed to the submission of defendant's age as a mitigating circumstance.

Thus, the plain language of the circumstances discussed immediately prior to and subsequent to the circumstance in question shows that they are statutory mitigating circumstances N.C.G.S. § 15A-2000(f)(1), (f)(2), (f)(6), and (f)(7), respectively. This context strongly implies that the circumstance in question was also a statutory mitigating circumstance. Furthermore, after discussing defendant's age, the trial court states, "Non-statutory mitigating factors, starting with paragraph five . . . ." This statement demonstrates that the trial court then changed its focus to the proposed nonstatutory mitigating circumstances. Based on this record, we conclude that the trial court's ruling that it would not submit the mitigating circumstance that "the murder was actually committed by another person" was a refusal to submit the proposed statutory mitigating circumstance that "defendant was an accomplice in or accessory to the capital felony committed by another person and his participation was relatively minor," N.C.G.S. § 15A-2000(f)(4), and analyze defendant's assignment of error accordingly.

"[T]he test for sufficiency of evidence to support submission of a statutory mitigating circumstance is whether a juror could reasonably find that the circumstance exists based on the evidence." *State v. Fletcher*, 348 N.C. 292, 323, 500 S.E.2d 668, 686 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 113 (1999). "[D]efendant has the burden of producing 'substantial evidence' tending to show the existence of a mitigating circumstance before that circumstance will be submitted to the jury." *State v. Rouse*, 339 N.C. 59, 100, 451 S.E.2d 543, 566 (1994) (quoting *State v. Laws*, 325 N.C. 81, 112, 381 S.E.2d 609, 627 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990)), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995).

Defendant contends that the trial court erred in assuming that a finding by the jury during the guilt-innocence phase that defendant killed the victim with premeditation precluded the jury from finding

during the sentencing phase that defendant did not personally commit the murder. In doing so, defendant argues, the trial court erroneously failed to consider that the jury had additional information at sentencing that was not present at the guilt-innocence phase. Defendant first directs the Court to his statement to investigators after his arrest in which he asserted that he was involved but that Freeman was the shooter. Defendant contends, furthermore, that Agent Tart's testimony regarding statements made by Frazier showed that Freeman had the rifle when he got into the car at Santiago's house and, thus, that Freeman was likely the shooter. Defendant contends that this was additional evidence, not presented at the guilt-innocence phase, that the jury could consider in determining which man fired the shots that killed Creech.

This argument is similar to one we recently rejected in *Fletcher*, 354 N.C. at 477, 555 S.E.2d at 547-48. In *Fletcher*, the defendant was convicted of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. *Id.* at 461, 555 S.E.2d at 538. At a resentencing proceeding, the defendant presented evidence, which was not presented at the guilt-innocence phase, that someone else had committed the murder. *Id.* at 477, 555 S.E.2d at 548. In holding that the trial court did not err in failing to submit the (f)(4) mitigating circumstance, the Court noted that that circumstance is "inapplicable where the defendant is convicted of premeditated and deliberate murder" under *State v. Roseboro*, 351 N.C. 536, 549, 528 S.E.2d 1, 10, *cert. denied*, 531 U.S. 1019, 148 L. Ed. 2d 498 (2000). *Fletcher*, 354 N.C. at 477, 555 S.E.2d at 547-48. In response to the defendant's argument that *Roseboro* should be inapplicable where additional evidence is presented at sentencing, the Court further held that the additional evidence presented at the resentencing was not substantial in showing that the defendant's participation was minor. *Id.* at 477, 555 S.E.2d at 548.

Similarly, even were we to hold that *Roseboro* does not apply where additional evidence is presented at sentencing, no substantial evidence was presented here to support that defendant's participation was minor. Defendant's own statement introduced at sentencing showed that he voluntarily went with Freeman, who was carrying a rifle, to commit an armed robbery. In the course of that robbery, defendant claims to have wrestled with one of the victims, picked up spent shells after Freeman fired the rifle, ascertained that the victims appeared to be dead, helped Freeman push the getaway car out of a ditch, then fled the scene in the car with Freeman. Thus, even if

defendant's statement is viewed as entirely, true, the statement is not substantial evidence from which the jury could have concluded that defendant's participation in the murder was minor. Therefore, the trial court properly refused to submit the requested mitigating circumstance.

Moreover, even assuming *arguendo* that this mitigating circumstance should have been submitted, any error was harmless beyond a reasonable doubt. In finding defendant guilty of premeditation and deliberation, the jury had previously determined beyond a reasonable doubt that defendant fired the rifle. The only new evidence presented was a self-serving statement made by defendant to investigators after his arrest and an inconsequential statement that Freeman was carrying the gun earlier in the night. Given that Santiago testified defendant stated that he shot the victims and Hardison identified defendant as the shooter, a reasonable probability does not exist that this additional evidence would be sufficient to change a juror's mind as to who shot the rifle.

**[6]** The second requested mitigating circumstance in question, that the initial idea that resulted in the victim's death was Michael Frazier's, is properly identified as a nonstatutory mitigating circumstance. Submission of a requested nonstatutory mitigating circumstance is required where:

"(1) the nonstatutory mitigating circumstance is one which the jury could reasonably find had mitigating value, and (2) there is sufficient evidence of the existence of the circumstance to require it to be submitted to the jury."

*State v. Green,* 336 N.C. 142, 182, 443 S.E.2d 14, 37 (quoting *Benson,* 323 N.C. at 325, 372 S.E.2d at 521), *cert. denied,* 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). During the trial court's review of the proposed nonstatutory mitigating circumstances, the following transpired:

[PROSECUTOR]: . . . [T]he State would vigorously object to . . . the proposed mitigator that "The initial idea that resulted in the death of the decedent was Michael Frazier's." That is very misleading. That makes it suggest as though it were Michael Frazier's idea to murder the victim. That's not the case at all. . . .

. . . .

. . . If it's going to be submitted, I would respectfully submit it needs to be completely re-worded . . . .

[DEFENSE COUNSEL]: Your Honor, we could say the initial idea for the plan that resulted in the death of the decedent was Michael Frazier's.

. . . .

THE COURT: According to the evidence that's been presented, I think the more appropriate wording would be "the initial idea for the robbery was Michael Frazier's." According to the statement of the Defendant, that's what he said, but—what's in evidence. So I'm going to amend [the proposed mitigating circumstance] to read, "The initial idea for the robbery was Michael Frazier's."

The amended mitigating circumstance was submitted to but not found to exist by the jurors. While defendant agrees that the circumstance that was ultimately submitted is a correct statement, he argues that the proposed mitigator that the initial idea that resulted in the death was Michael Frazier's was also correct. Furthermore, defendant argues that the proposed mitigator was not subsumed in the one actually submitted; the proposed circumstance focused on the correlation between the initial idea and the death rather than the robbery. Moreover, defendant argues, as the robbery indisputably resulted in the death, the requested mitigating circumstance was supported by substantial evidence and should have been submitted to the jury.

Assuming *arguendo* that the proposed circumstance was not subsumed in the submitted circumstance, this argument is still without merit. The jury easily could have misinterpreted the proposed circumstance to mean that the initial idea for the murder was Michael Frazier's—a circumstance not supported by substantial evidence. Thus, the trial court properly amended the requested mitigator to avoid a misinterpretation unsupported by substantial evidence. *See Jaynes*, 353 N.C. at 562, 549 S.E.2d at 199-200 (noting that a broadly worded circumstance susceptible to different interpretations violates the rule that "[a] mitigating circumstance should direct the jurors to *specific* aspects of the crime, defendant's character, or defendant's record which could serve as a basis for finding the defendant is less deserving of the death penalty").

Moreover, we note that once the trial court announced its amendment, defendant did not object to the amended circumstance or offer alternative wording to emphasize the correlation between the initial

STATE v. HOLMES

[355 N.C. 719 (2002)]

plan and Creech's death. Thus, as the proposed nonstatutory circumstance would likely be interpreted in a manner not supported by substantial evidence, we overrule this assignment of error.

[7] Defendant contends by another assignment of error that the trial court erred in denying defendant's request to instruct the jury that it could not use the same evidence to support more than one aggravating circumstance. Defendant further alleges that the trial court subsequently instructed the jury in a manner that permitted finding the (e)(5) aggravating circumstance, that the murder was committed during a robbery, and the (e)(11) aggravating circumstance, that the murder was part of a course of conduct including crimes of violence against others, based solely upon evidence that someone went through Hardison's pockets. We decline to address defendant's claim that this error violated his constitutional due process rights, as a constitutional basis was not raised at trial. *See Benson*, 323 N.C. at 322, 372 S.E.2d at 519.

"Where . . . there is separate evidence supporting each aggravating circumstance, the trial court may submit both 'even though the evidence supporting each may overlap.'" *Rouse*, 339 N.C. at 97, 451 S.E.2d at 564 (quoting *State v. Gay*, 334 N.C. 467, 495, 434 S.E.2d 840, 856 (1993)). In this case, separate evidence supported both the (e)(5) and (e)(11) aggravating circumstances. The jury found defendant guilty of the first-degree murder of Creech, the attempted first-degree murder of Hardison, and robbery with a firearm. Based upon these verdicts, separate, independent evidence supported each aggravating circumstance: the robbery supported the (e)(5) aggravating circumstance, while the attempted murder of Hardison supported the (e)(11) aggravating circumstance. Thus, the trial court's decision to submit both circumstances was proper under *Rouse*.

Defendant contends, however, that the overlap in the evidence, without the requested limiting instruction, allowed the jury to improperly find that the evidence that someone went through Hardison's pockets, which is an attempted robbery, supported both the (e)(5) and (e)(11) aggravating circumstances. "When the court perceives a possible overlap of evidence supporting more than one aggravating circumstance *and* when the court is requested to instruct the jury that the same evidence cannot be used as a basis for finding more than one aggravating circumstance, it should do so." *State v. Smith*, 352 N.C. 531, 565, 532 S.E.2d 773, 795 (2000), *cert. denied*, 532 U.S. 949, 149 L. Ed. 2d 360 (2001). Thus, whether defendant properly requested such a limiting instruction is a key initial inquiry.

The following discussion took place during the sentencing charge conference in this case:

[DEFENSE COUNSEL]: . . . I would like to ask for an instruction that the same evidence cannot be used in support of more than one aggravator.

THE COURT: Do you have an instruction, proposed instruction?

[DEFENSE COUNSEL]: No, I don't.

THE COURT: The law will take care of it. The instruction will stand as set forth.

[DEFENSE COUNSEL]: Yes, sir.

Based upon this discussion, defendant argues that the trial court should have given the limiting instruction under *Smith*.

We begin our analysis by noting that defendant never properly requested the instruction to which he now claims he was entitled. N.C.G.S. § 15A-1231 provides, in pertinent part, that "[a]t the close of the evidence . . . , any party may tender written instructions." N.C.G.S. § 15A-1231(a)(2001). The transcript reveals that defendant made only an oral request for the limiting instruction. Thus, defendant did not properly request this limiting instruction.

Even were we to assume error *arguendo*, defendant cannot show a "reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a). At the conclusion of the guilt-innocence phase, the jury found defendant guilty of the first-degree murder of Creech and the attempted first-degree murder of Hardison. The jury also found defendant guilty of robbery with a firearm rather than the available option of attempted robbery with a firearm. No evidence supported a finding that anything was taken from Hardison when someone went through his pockets. Therefore, the conviction for robbery with a firearm was necessarily based on the evidence that the shotgun and pistol were taken from the trailer. The trial court, on the "Issues and Recommendation as to Punishment" form, worded the (e)(5) aggravating circumstance as follows, "Was this murder committed by the Defendant while the Defendant was engaged in the commission of Robbery with a Firearm." The jury having already determined that defendant committed robbery with a firearm, no reasonable possibility exists that it relied on evidence of an attempted

robbery of Hardison to find the (e)(5) aggravating circumstance, particularly where the form directed its attention to commission of the robbery with a firearm. Clearly, the jury found the (e)(5) aggravating circumstance to exist based on the completed robbery and found the (e)(11) aggravating circumstance to exist based on the attempted murder of Hardison. Thus, defendant has failed in his burden to show prejudice resulting from any error. For these reasons, this assignment of error is overruled.

[8] Defendant next contends that the trial court erred in failing to submit the (f)(6) mitigating circumstance, that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. As noted earlier, a statutory mitigating circumstance must be submitted if defendant has produced substantial evidence of the circumstance such that a juror could reasonably find the circumstance to exist.

The (f)(6) mitigating circumstance

> may exist even if a defendant has capacity to know right from wrong, to know that the act he committed was wrong, and to know the nature and quality of that act. It would exist even under these circumstances if the defendant's capacity to appreciate (to fully comprehend or be fully sensible of) the criminality (wrongfulness) of his conduct was impaired (lessened or diminished), or if defendant's capacity to follow the law and refrain from engaging in the illegal conduct was likewise impaired (lessened or diminished).

*State v. Johnson*, 298 N.C. 47, 68, 257 S.E.2d 597, 613 (1979), *quoted in State v. Ward*, 338 N.C. 64, 107, 449 S.E.2d 709, 733 (1994), *cert. denied*, 514 U.S. 1134, 131 L. Ed. 2d 1013 (1995). Furthermore, this Court has noted that the (f)(6) statutory mitigating circumstance has been found to be supported only in "cases where there was evidence, expert or lay, of some mental disorder, disease, or defect, or voluntary intoxication by alcohol or narcotic drugs, to the degree that it affected the defendant's ability to understand and control his actions." *State v. Syriani*, 333 N.C. 350, 395, 428 S.E.2d 118, 142-43, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993).

Defendant argues that the testimony of Dr. John Warren, an expert in the field of forensic psychology, supports submission of this mitigating circumstance as it established that defendant suffers from a personality disorder brought on by emotional and physical abuse

and aggravated by chronic depression, poly-substance abuse, and the death of his father. However, Dr. Warren also testified that defendant's "mental and emotional state was not such that it would have prohibited him from knowing what was going on around him, or what he was doing." Moreover, Dr. Warren later testified that he was not suggesting that defendant was unable to tell the difference between right and wrong or to appreciate the nature and quality of his actions.

This evidence does not show that defendant's ability to appreciate the criminality of his actions or to conform his conduct to the law was impaired. At most, Dr. Warren's testimony shows that defendant operated under a mental or emotional disturbance at the time of the murder. Thus, this evidence is properly considered under the (f)(2) statutory mitigating circumstance, that the murder "was committed while the defendant was under the influence of mental or emotional disturbance." N.C.G.S. § 15A-2000(f)(2). The (f)(2) mitigating circumstance was submitted to the jury, and the jury found it to exist. Accordingly, we hold that the trial court properly refused to submit the (f)(6) mitigating circumstance.

## PRESERVATION ISSUES

Defendant raises two additional issues that he concedes have previously been decided contrary to his position by this Court: (i) whether the trial court erred by instructing jurors that they were permitted to reject submitted nonstatutory mitigators on the basis that they did not have mitigating value; and (ii) whether the North Carolina death penalty statute is unconstitutional in that the death sentence is a cruel and unusual punishment imposed in an arbitrary and discriminatory manner.

Defendant raises these issues for purposes of urging this Court to reexamine its prior holdings. We have considered defendant's arguments on these issues and conclude that defendant has demonstrated no compelling reason to depart from our prior holdings. We thus overrule these assignments of error.

## PROPORTIONALITY

[9] Finally, this Court exclusively has the statutory duty in capital cases, pursuant to N.C.G.S. § 15A-2000(d)(2), to review the record and determine: (i) whether the record supports the jury's findings of the aggravating circumstances upon which the court based its death sentence; (ii) whether the sentence was imposed under the influence

of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

After a thorough review of the transcript, record on appeal, briefs, and oral arguments of counsel, we are convinced that the jury's findings of the three aggravating circumstances submitted were supported by the evidence. We also conclude that nothing in the record suggests that defendant's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Finally, we must consider whether the imposition of the death penalty in defendant's case is proportionate to other cases in which the death penalty has been affirmed, considering both the crime and the defendant. *Robinson*, 336 N.C. at 133, 443 S.E.2d at 334. The purpose of proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). Our consideration is limited to those cases that are roughly similar as to the crime and the defendant, but we are not bound to cite every case used for comparison. *Syriani*, 333 N.C. at 400, 428 S.E.2d at 146. Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *Green*, 336 N.C. at 198, 443 S.E.2d at 47.

In the case at bar, defendant was convicted of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. Defendant was also convicted of attempted first-degree murder and robbery with a firearm. The jury found all of the aggravating circumstances submitted: (i) that defendant had been previously convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); (ii) that the murder was committed while defendant was engaged in the commission of robbery with a firearm, N.C.G.S. § 15A-2000(e)(5); and (iii) that the murder was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

The trial court submitted four statutory mitigating circumstances for the jury's consideration: (i) defendant has no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); (ii) the crime was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (iii) defendant's age at the time of the murder, N.C.G.S. § 15A-2000(f)(7); and (iv) the catchall mitigating circumstance that there existed any other circumstance arising from the evidence which the jury deemed to have mitigating value, N.C.G.S. § 15A-2000(f)(9). The jury found only the (f)(2) and (f)(9) statutory mitigating circumstances to exist. The trial court also submitted forty-five nonstatutory mitigating circumstances; the jury found twenty-three of these circumstances to exist and to have mitigating value.

We begin our proportionality analysis by comparing this case to those cases in which this Court has determined the sentence of death to be disproportionate. This Court has determined the death sentence to be disproportionate on seven occasions. *Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). This case is not substantially similar to any of the cases in which this Court has found that the death sentence was disproportionate.

We also consider cases in which this Court has found the death penalty to be proportionate. Defendant in this case entered the victim's home, shot two men, ransacked the home, and left the men for dead. "A murder in the home 'shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure.'" *State v. Adams*, 347 N.C. 48, 77, 490 S.E.2d 220, 236 (1997) (quoting *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987)) (alterations in original), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998). Defendant was convicted in part under a theory of premeditation and deliberation. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S.

1023, 108 L. Ed. 2d 604 (1990). Furthermore, this Court has deemed all three of the aggravating circumstances present in this case, standing alone, to be sufficient to sustain a sentence of death. *State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). Viewed in this light, we conclude that the present case is more analogous to cases in which we have found the sentence of death proportionate than to those cases in which we have found the sentence disproportionate or to those cases in which juries have consistently returned recommendations of life imprisonment.

Defendant received a fair trial and capital sentencing proceeding, free from prejudicial error; and the death sentence in this case is not disproportionate. Accordingly, the judgments of the trial court are left undisturbed.

NO ERROR.