UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-27

ERIC LAWRENCE CALL,

Petitioner - Appellant,

versus

GERALD J. BRANKER, Warden, Central Prison,
Raleigh, North Carolina,

Respondent - Appellee.

Appeal from the United States District Court for the Western
District of North Carolina, at Statesville. Lacy H. Thornburg,
District Judge. (5:04-cv-00167)

Argued: September 27, 2007        Decided: November 20, 2007

Before TRAXLER and KING, Circuit Judges, and Benson E. LEGG, Chief
United States District Judge for the District of Maryland, sitting
by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Marilyn Gerk Ozer, William F. W. Massengale, MASSENGALE &
OZER, Chapel Hill, North Carolina, for Appellant. Sandra Wallace-
Smith, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF
JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Roy
Cooper, Attorney General, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Eric Lawrence Call was convicted by a North Carolina jury of the capital murder, kidnapping, and robbery of Macedonio Hernandez Gervacio ("Macedonio"), and of assault with a deadly weapon with intent to kill Gabriel Gervacio ("Gabriel"), in a failed attempt to eliminate Gabriel as a potential witness to Macedonio's murder.[1] Call was sentenced to death for the murder. On appeal, the Supreme Court of North Carolina affirmed the murder conviction but remanded for resentencing on the capital conviction. See State v. Call, 508 S.E.2d 496 (N.C. 1998).[2] Call was again sentenced to death. The North Carolina Supreme Court affirmed the sentence, see State v. Call, 545 S.E.2d 190 (N.C. 2001), and the United States Supreme Court denied Call's petition for writ of certiorari, see Call v. North Carolina, 534 U.S. 1046 (2001). After unsuccessfully challenging his conviction and sentence in state post-conviction proceedings, Call filed a petition for writ of habeas corpus in federal district court. See 28 U.S.C.A. § 2254 (West 2006). The district court denied relief. We granted a certificate of appealability, see 28 U.S.C.A. § 2253(c)(1) (West 2006), and now affirm.

---

[1] There is some confusion regarding the victims' names, likely stemming from cultural differences in the placement of surnames. For this reason, we refer to the victims by their first names, "Macedonio" and "Gabriel".

[2] Call's convictions and sentences for the non-capital crimes are not at issue in this appeal.

I.

On the evening of August 24, 1995, at approximately 9:30 p.m., Call went to the trailer of Macedonio and Gabriel and offered Macedonio twenty-five dollars to help him move furniture. Macedonio told Gabriel that he would "be right back" and left with Call. Call, 545 S.E.2d at 195 (internal quotation marks omitted). Call instead took Macedonio to a nearby cornfield where he robbed him and then "beat [him] to death with a shovel handle and a tire iron, tied his right foot up around his head, and tied his hands behind his back." Call, 508 S.E.2d at 504. At some point, Call realized that Gabriel would be able to place him with the murder victim that evening and decided to eliminate Gabriel as a witness. At approximately 11:00 p.m., Call returned to the trailer and offered Gabriel twenty dollars to help him move a refrigerator. Gabriel accepted and left with Call in Call's pickup truck. Call then returned to the cornfield where he unsuccessfully attempted to kill Gabriel as well:

> [D]efendant lured Gabriel outside of the vehicle by telling him the pickup truck was stuck. As Gabriel pushed the bumper of the pickup, defendant picked up an aluminum bat and, after pretending to use the bat to lift the tire, struck Gabriel on the head. Gabriel recovered, stood up, and ran to the edge of a nearby river. Defendant ran after him briefly, then returned to the pickup truck and departed the area. Gabriel then ran into the cornfield and lay on the ground all night.
>
> The next morning, Gabriel swam across the river and sought assistance at area homes. Eventually, Gabriel received a ride home. At approximately 7:00 p.m. on 25 August 1995, Gabriel, through an interpreter, told the

3

trailer park owner, David Shatley, what had happened the previous night. Thereafter, law enforcement officers were contacted, and Gabriel led a search team back to the cornfield to search for [Macedonio]. When the search party arrived at the cornfield, Gabriel excitedly told the same interpreter that defendant had brought him to that location and assaulted him. After walking six to eight rows into the cornfield, law enforcement officers found a baseball cap on the ground and noticed several broken corn stalks. As they continued their search, the officers noticed a plaid shirt near the edge of the cornfield. After walking toward the shirt, the officers discovered that the shirt was on the victim's body. The victim's body was partially covered by corn stalks. The officers noted that the victim had suffered severe head injuries. The victim's right foot was tied up to his shoulder area with a yellow rope, and the victim's hands were tied behind his back with a white rope. Shatley identified the victim's body, and Gabriel identified the baseball cap as the one the victim was wearing when he left the trailer with defendant. The officers also discovered a broken stick, similar to a shovel handle, at the scene.

After the victim's body was found, the authorities immediately began to search for defendant. Defendant was not found at his residence. However, based on information obtained at defendant's residence, a warrant was issued for his arrest. Defendant was arrested on 27 August 1995 in a motel room in Monroe, North Carolina. Defendant and his pickup truck were brought back to Ashe County, where officers inventoried the contents of defendant's pickup truck. Among items inventoried, officers found a bag of clothes and a steel rod that appeared to have blood and hair embedded in it. In addition, officers recovered a motel registration form in the name of "Rick N. Finley." A handwriting expert later determined that the registration form was written by defendant.

Call, 545 S.E.2d at 195.

Shortly after the murder, police interviewed Alan Varden, who was a close friend of Call and his wife Jenny. Varden told the police that Call had discussed robbing Macedonio with him on

4

several occasions and had attempted to recruit Varden to help. Varden also informed the police that he was at the Call home on the evening of the murder. According to Varden, Call came home after kidnapping Macedonio, but before returning for Gabriel, and eventually told Varden what he had done. Specifically, Call "told Varden that he had hit the victim over the head, had broken a shovel handle, and had hit the victim with a tire iron. Defendant also described how he had tied the victim's right leg and hands behind the victim's back." Id. at 196. Call "told Varden he needed to go back and check the victim's pulse and that he also needed to get Gabriel," but Varden again refused to help. Id. Later that evening, Call returned to his home and "told Varden that he had hit Gabriel with [a] bat [belonging to Varden] but that Gabriel had gotten away." Id. Call packed his clothes to run and he, Jenny and Varden went to Varden's home, where Call shaved his beard and mustache and left a note declaring that his wife had no knowledge of "what might have taken place." Call, 508 S.E.2d at 510 (internal quotation marks omitted). Call also returned the baseball bat to Varden, which Varden wiped clean, and told Varden and Jenny that he was going to Monroe or Charlotte. Varden found Call's note at his residence and gave it to the police.

During the guilt phase of Call's trial, Gabriel testified regarding the events of that evening, including the fact that he last saw Macedonio leaving with Call to move furniture and that

5

Call later lured him to the cornfield under the same pretense, where Call brutally attacked him with the baseball bat. Varden also testified during the guilt phase, relating in detail the conversations he had with Call about the plan to rob Macedonio and his encounters with Call and Jenny on the evening of the murder. Steve Cabe, an agent with the North Carolina State Bureau of Investigation, testified about the investigation of the gruesome crime scene and was also questioned and cross-examined about the statements Varden made to the authorities during that investigation. Agent Cabe's statements were admitted to corroborate Varden's incriminating testimony.

At the conclusion of the guilt phase, Call was convicted by the jury of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. The jury also found Call guilty of robbery with a dangerous weapon, first-degree kidnapping, and assault with a deadly weapon with intent to kill inflicting serious injury. At the conclusion of a separate sentencing hearing, the jury recommended a sentence of death. Call was appointed new counsel for his direct appeal. The North Carolina Supreme Court affirmed Call's convictions but vacated the sentence of death because the state had been allowed to impeach Call with evidence of his post-Miranda silence. The case was remanded for resentencing only. See Call, 508 S.E.2d at 524.

At the resentencing hearing, held on May 17, 1999, Call was represented by his previous trial counsel, Anthony Lynch and Donald Willey.  The state presented a number of witnesses, including Dr. Thomas A. Sporn, a forensic pathologist who reviewed the autopsy photographs and report prepared by Dr. Robert Thompson.  Dr. Sporn testified that Macedonio's "body showed a pattern of blunt-force injuries to the head and facial area that could have been caused by a baseball bat, a shovel handle, or a tire iron."  Call, 545 S.E.2d at 196.  There was "splitting of the victim's skin and fracturing of the victim's skull at the forehead and beneath the left eye, as well as splitting and tearing of the skin and fracturing of the skull above the victim's ear."  Id.  "Dr. Sporn's opinion with regard to the number of blows the victim received was based, in part, on Dr. Thompson's assessment that the victim had suffered at least eleven blows to the head."  Id.

The state did not, however, seek to reintroduce live testimony by Gabriel or Varden.  Gabriel had returned to Mexico and the state unsuccessfully attempted to return him to the United States on a temporary visa.  Over Call's objection and following a fairly extensive hearing, Gabriel was declared unavailable as a witness and his recorded testimony from the guilt phase was read into evidence.  Varden's guilt-phase testimony was not read into evidence, nor was he called as a live witness.  Rather, the state presented Varden's version of the events surrounding the murder

7

solely via the testimony of SBI Agent Cabe, who again recounted the substance of what Varden had told him during interviews conducted immediately after the murder. Call's trial counsel did not object to the presentation of Varden's statements in this manner, nor was the state asked to demonstrate that Varden was unavailable as a witness. However, Call's trial counsel did cross-examine Agent Cabe regarding Varden's statements, as he had done during the guilt phase. Call did not seek to introduce Varden's recorded testimony from the guilt phase or to call Varden as a live witness.

At the conclusion of the resentencing hearing, the jury found four aggravating circumstances: (1) that the murder was committed while Call was engaged in the commission of a kidnapping; (2) that the murder was committed for pecuniary gain; (3) that the murder was especially heinous, atrocious or cruel; and (4) that the murder was part of a course of conduct in which Call engaged that included the commission by Call of other crimes of violence against another person. The jury found only six of twenty-three submitted mitigating circumstances, found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, and recommended a sentence of death, which the trial court imposed.

On direct appeal, Call was appointed appellate counsel, who raised a number of issues but no claim that Agent Cabe's testimony regarding Varden's statements violated Call's rights under the Confrontation Clause. The North Carolina Supreme Court found no

8

error in the resentencing and affirmed the sentence of death, see id. at 210, and the United States Supreme Court denied certiorari, see Call, 534 U.S. at 1046.

In 2002, Call was again appointed counsel, who initiated state post-conviction proceedings by filing a motion for appropriate relief ("MAR") in the North Carolina Superior Court. Call alleged, among other things, that his trial counsel were constitutionally ineffective under the Sixth Amendment for failing to object on Confrontation Clause grounds to Agent Cabe's testimony. Call alleged that his appellate counsel was also ineffective for failing to raise, as plain error, a Confrontation Clause challenge to this testimony.

On June 17, 2003, the state court denied relief. The court found that trial counsel could not "be found ineffective based on a futile objection." J.A. 310. In addition, the court found that "Agent Cabe's testimony was a dry second hand account that benefitted Call by minimizing the retelling of the acts establishing Call's guilt," and that trial counsel's cross-examination of Agent Cabe had been "strong and effective." J.A. 311. Thus, the court concluded that "[t]rial counsel performed professionally and competently," that "[a]ny error or errors that counsel may have made did not prejudice Call," and that there was "no reasonable probability that, but for the error or errors, there would have been a different result in the proceedings." J.A. 319.

The court also rejected Call's claim that appellate counsel was ineffective, noting that "[a]ppellate counsel, an assistant appellate defender specializing in criminal appellate cases, filed an extensive, well researched brief, raising numerous valid assignments of error" and could not be found ineffective based upon an issue that was "without merit and that would not have been successful on direct appeal." J.A. 311. Finally, the court concluded that there was "overwhelming evidence to support the aggravating circumstances underlying Call's sentence of death." J.A. 322. The North Carolina Supreme Court denied Call's petition for writ of certiorari. See State v. Call, 589 S.E.2d 130 (2003).

In 2004, Call filed a second MAR, asserting that Agent Cabe's testimony violated his rights under the Confrontation Clause as interpreted in Crawford v. Washington, 541 U.S. 36 (2004). Prior to Crawford, an unavailable witness's statement could be introduced if the statement bore "adequate indicia of reliability." Ohio v. Roberts, 448 U.S. 56, 66 (1980) (internal quotation marks omitted). In Crawford, however, the Court held that the Confrontation Clause bars the admission of testimonial statements of an unavailable witness if the defendant has had no prior opportunity for cross-examination. See Crawford, 541 U.S. at 68.

The state MAR court again denied relief, holding that Crawford, issued after Call's case became final, did not apply

retroactively.[3]  However, the court addressed the merits of the claim, reiterating that "[t]he details of Alan Varden's statement were introduced as a 'dry second hand account' which effectively as possible minimized the retelling of the acts establishing Call's guilt" and that "[t]rial counsel's cross-examination of Agent Cabe regarding Varden's statement was effective and without the risk of denials by Varden." J.A. 341. The court also found it significant that "Call had a prior opportunity to cross-examine Alan Varden" regarding his statements but "made no attempt to call Varden as a witness or to introduce his prior sworn testimony" at the resentencing hearing, and that "[t]he jury [had already] rejected Call's attempt to blame Varden during the guilt phase of his trial." J.A. 341. Finally, the court concluded that "[t]he aggravating circumstances were strongly supported by the details provided by Gabriel Gonzalez, the medical examiner[,] and the witnesses to the gruesome crime scene where Macedonio was found beaten and 'hog-tied' with only nine dollars in his pocket." J.A. 342. The North Carolina Supreme Court again denied certiorari review. See State v. Call, 604 S.E.2d 916 (2004).

---

[3]Call does not pursue the Confrontation Clause challenge under Crawford in this proceeding, nor would Crawford have constituted "clearly established" law at the time of the resentencing. The United States Supreme Court has also held that Crawford announced a "new rule" of criminal procedure, not applicable retroactively to cases already final on direct review. See Whorton v. Bockting, 127 S. Ct. 1173, 1184 (2007).

Pursuant to 28 U.S.C.A. § 2254, Call filed this petition for a writ of habeas corpus in the district court. The district court denied the petition, see Call v. Polk, 454 F. Supp. 2d 475 (W.D.N.C. 2006), and denied a certificate of appealability. We granted a limited certificate of appealability to consider whether Call's rights to effective assistance of counsel under the Sixth Amendment were violated by trial counsel's failure to object to Agent Cabe's testimony at the resentencing hearing on Confrontation Clause grounds and by appellate counsel's failure to raise the Confrontation Clause issue on direct appeal to the North Carolina Supreme Court as plain error. We now affirm.

II.

A.

The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence," U.S. Const. amend. VI, and that such assistance be effective, see Strickland v. Washington, 466 U.S. 668, 686 (1984). In order to establish a claim for ineffective assistance of counsel, a defendant is required to demonstrate "that counsel's performance was deficient" and that "the deficient performance prejudiced the defense." Id. at 687. To demonstrate inadequate performance, the defendant "must show that counsel's representation fell below an objective standard of

12

reasonableness" measured by "prevailing professional norms." Id. at 688. To demonstrate prejudice, Call "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

In death sentence challenges such as this, "the question is whether there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695. "To avoid 'the distorting effects of hindsight,' however, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Williams v. Ozmint, 494 F.3d 478, 484 (4th Cir. 2007) (quoting Strickland, 466 U.S. at 689). "The defendant (or petitioner) bears the burden of overcoming this presumption." Id.

The defendant's right to effective assistance of counsel also extends to the direct appeal of a criminal conviction and requires the same showing of deficient performance and prejudice. See Evitts v. Lucey, 469 U.S. 387, 396 (1985); Bell V. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) (en banc). Appellate counsel is accorded a "'presumption that he decided which issues were most likely to afford relief on appeal.'" Bell, 236 F.3d at 164 (quoting Pruett

13

v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993)). "Counsel is not obligated to assert all nonfrivolous issues on appeal, as '[t]here can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review.'" Id. (quoting Jones v. Barnes, 463 U.S. 745, 752 (1983)). "Winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy," and "counsel's failure to raise a weak constitutional claim may constitute an acceptable strategic decision designed to avoid diverting the appellate court's attention from what [counsel] felt were stronger claims." Id. (alteration, citations, and internal quotation marks omitted). In sum, while "it is still possible to bring a Strickland claim based on counsel's failure to raise a particular claim on direct appeal, . . . it will be difficult to demonstrate that counsel was incompetent." Id. (internal quotation marks and alteration omitted). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Id. (internal quotation marks omitted).

### B.

Because the state court decided Call's Sixth Amendment ineffectiveness claims on the merits, we are constrained to review

14

them in light of the limits on federal habeas review of a state conviction imposed by 28 U.S.C.A. § 2254(d). When a habeas petitioner's constitutional claim has been "adjudicated on the merits in State court proceedings," we may not grant relief unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d).

A state court's decision is contrary to clearly established federal law under § 2254(d) where it "applies a rule that contradicts the governing law set forth" by the United States Supreme Court or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. Factual determinations made by the state court "shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness

15

by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1) (West Supp. 2006).

## III.

The applicability of the Confrontation Clause in capital sentencing proceedings has not been "clearly established" by Supreme Court precedents. See Maynard v. Dixon, 943 F.2d 407, 414 n.5 (4th Cir. 1991) (noting that the question of whether the Confrontation Clause applies in sentencing proceedings is undecided); cf. United States v. Higgs, 353 F.3d 281, 324 (4th Cir. 2003) (noting that "[i]t is far from clear that the Confrontation Clause applies to a [federal] capital sentencing proceeding"). However, the question before us is not whether the Confrontation Clause applies to capital sentencing hearings as a matter of federal law. Because North Carolina recognized the general applicability of the Confrontation Clause in capital sentencing proceedings at the time of Call's resentencing, see State v. Jaynes, 549 S.E.2d 179, 194-96 (N.C. 2001); State v. McLaughlin, 462 S.E.2d 1, 19 (N.C. 1995), the question before the state MAR court was whether Call's counsel were constitutionally ineffective for failing to object to Agent Cabe's testimony on Confrontation Clause grounds and failing to raise the constitutional issue on direct appeal as plain error. The precise question before us, however, is whether the state court's rejection of Call's ineffectiveness claims is contrary to or an unreasonable

16

application of clearly established Supreme Court precedents governing such Sixth Amendment claims. For the reasons that follow, we conclude that it was not.

A.

We begin with Call's claim that his trial counsel was ineffective for failing to object to Agent Cabe's testimony as violative of the Confrontation Clause and that the state court's rejection of this claim was an unreasonable application of Strickland and its progeny.

The basis for the state court's rejection of this claim is two-fold. First, the state court concluded counsel were not constitutionally deficient for failing to object because any Confrontation Clause objection to Agent Cabe's testimony would have been a "futile" one. J.A. 310. The state argues on appeal that this is because the Confrontation Clause, as applied by the North Carolina courts, did not prohibit Agent Cabe from testifying about Varden's statements because Varden had testified during the guilt-phase of Call's trial and was subjected to cross-examination at that time. Second, the state court concluded that counsel's failure to raise the issue was not constitutionally deficient because the introduction of the substance of Varden's testimony via "a dry second hand account" of Agent Cabe "benefitted Call by minimizing the retelling of the acts establishing Call's guilt." J.A. 311. In other words, even if Agent Cabe's testimony

17

technically violated the Confrontation Clause and would have been excluded had an objection been made, trial counsel's decision to allow introduction of the substance of that evidence via the "dry second hand account" of Agent Cabe instead of the compelling first-hand testimony of Varden himself was neither constitutionally deficient representation nor prejudicial to Call.[4]  Because we cannot say that the North Carolina state court's adjudication of this claim was an unreasonable one, Call is not entitled to habeas relief.

1.

Pursuant to the statute governing capital sentencing proceedings in North Carolina, "there shall not be any requirement to resubmit evidence presented during the guilt determination phase of the case, unless a new jury is impaneled, but all such evidence is competent for the jury's consideration in passing on punishment."  N.C. Gen. Stat. § 15A-2000(a)(3).  Additionally, "[e]vidence may be presented as to any matter that the court deems relevant to sentence, and may include matters relating to any of the aggravating or mitigating circumstances . . . .  Any evidence which the court deems to have probative value may be received."  Id.

---

[4]Because we deny relief on the merits of Call's habeas claims, it is unnecessary for us to address the state court's additional determination that the claims were procedurally barred.

18

In the context of a resentencing hearing, this means that "the State [is] required to resubmit the evidence presented in the original trial in order to have it considered [by the resentencing jury], but such evidence [is] competent as a matter of law." McLaughlin, 462 S.E.2d at 18. The hearsay rules of evidence governing admissibility and exceptions, see N.C.G.S. § 8C-1, Rule 804, including the requirement that the declarant be deemed "unavailable" as that term is defined therein, are not controlling. See McLaughlin, 462 S.E.2d at 18. "Instead, N.C.G.S. § 15A-2000(a)(3) expressly provides that evidence presented during the guilt determination phase of a capital case is competent and admissible as a matter of law during a capital sentencing proceeding in the same case." Id. at 18-19.

North Carolina also requires its courts to address, if raised, the issue of "whether the admission of that recorded prior testimony violates defendant's confrontation rights under the federal and state constitutions." Id. at 19; see also Jaynes, 549 S.E.2d at 195; see also State v. Holmes, 565 S.E.2d 154, 165 (N.C. 2002) (noting that "[w]hile the Rules of Evidence do not apply to a capital sentencing proceeding [in North Carolina], the constitutional right to confront witnesses does apply" (citations omitted)).

At the time of Call's resentencing, North Carolina applied the "residual trustworthiness" test of Ohio v. Roberts. "The principal

purpose of [the] confrontation [right was] to secure to the defendant the right to test the evidence of the witnesses against him through cross-examination." Holmes, 565 S.E.2d at 165 (internal quotation marks omitted). But, the "defendant's mere lack of an opportunity to cross-examine a witness d[id] not necessarily mean . . . that the defendant's confrontation rights were violated." Id. If the court was "confident – as in the context of hearsay falling within a firmly rooted exception – that 'the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility,' the Sixth Amendment's residual 'trustworthiness' test allow[ed] the admission of the declarant's statements." Id. (quoting Lilly v. Virginia, 527 U.S. 116, 136 (1999); see also Ohio, 448 U.S. at 66. The admission of testimony failing to meet the residual trustworthiness test was reviewed for harmlessness. See Holmes, 565 S.E.2d at 165.

In this case, Varden testified during the guilt phase, and his testimony was subjected to vigorous and effective cross-examination by Call's trial counsel. Agent Cabe was also allowed to discuss Varden's statements during the guilt phase as a prior consistent or corroborating statement, and he too was effectively cross-examined. And both the state and Call were free, under North Carolina rules, to resubmit Varden's guilt-phase testimony in the resentencing proceeding if they had felt it necessary or helpful. Thus, unlike

20

situations in which the state seeks to introduce testimony or statements of witnesses whom the defendant has never had an opportunity to cross-examine, Call in fact had the opportunity to cross-examine both witnesses during the guilt phase, had available to him the recorded testimony (including his own cross-examination) of these witnesses for reintroduction at any time, and cross-examined Agent Cabe during the resentencing hearing.[5]  The state contends that, because Call was afforded these opportunities, Agent Cabe's testimony relating Varden's statements was evidence "competent for the jury's consideration in passing on punishment" under the statute and, as applied by the North Carolina courts, not violative of the Confrontation Clause.

Purely from a Confrontation Clause standpoint, it troubles us that Varden's recitation of the events surrounding the murder was not resubmitted in the resentencing proceeding via a reading of his

---

[5]In McLaughlin, the court made no mention of a requirement that the state demonstrate unavailability of a declarant for a resentencing proceeding where the declarant had testified in the guilt phase of the same proceeding and defendant's "motivation to cross-examine [the declarant] then was the same as his motivation at the new capital sentencing proceeding". McLaughlin, 462 S.E.2d at 19.  And in Jaynes, the trial court allowed testimony of a witness in the defendant's first guilt/sentencing trial to be read to the jury.  The North Carolina Supreme Court noted that the trial court had also found that the witness was unavailable to testify at the defendant's resentencing proceeding, a fact that was uncontested, but also noted that "[s]uch evidence would normally be presumed admissible at a later proceeding." Jaynes, 549 S.E.2d at 195 (emphasis added).  In State v. Nobles, 584 S.E.2d 765, 768 (N.C. 2003), in contrast, the court was concerned with the admissibility of the transcribed testimony of an unavailable witness from a prior criminal proceeding against the defendant.

21

prior testimony.  Rather, Agent Cabe presented the substance of Varden's testimony by reading his handwritten notes of the interviews of Varden.  The substance was largely the same, but it was nonetheless a different version of those statements.  The question before us, however, is not whether we believe that Agent Cabe's testimony would violate the Confrontation Clause in a capital sentencing proceeding.  Nor are we called upon to decide how the North Carolina statute affects North Carolina's view of the applicability of the Confrontation Clause in this context.  Rather, we are constrained to answer a more narrow question:  whether the state court's finding -- that trial counsel was not ineffective because an objection under the Confrontation Clause would have been futile in North Carolina -- was contrary to or an unreasonable application of Supreme Court precedents governing the right to constitutionally effective assistance of counsel.  At a minimum, we think it far from clear that the North Carolina trial court or the North Carolina Supreme Court on appeal would have considered Agent Cabe's testimony to be a violation of the Confrontation Clause.

2.

Even if we were to assume that North Carolina would have considered Agent Cabe's testimony to be violative of the Confrontation Clause, however, Call would still not be entitled to habeas relief.  The state court also found that trial counsel's failure to lodge an objection was not deficient performance, and

22

did not prejudice Call, because the introduction of the substance of Varden's testimony via the "a dry second hand account" of Agent Cabe "benefitted Call by minimizing the retelling of the acts establishing Call's guilt."  J.A. 311.  Having reviewed the testimony of Varden and Agent Cabe in the state court proceedings, we agree.

During the guilt phase of Call's trial, Varden offered a compelling and damaging first-hand account of Call's plans to rob Macedonio, including his consideration of possible weapons and crime locations, as well as his attempts to enlist Varden's help with the crimes.  Varden related in detail Call's return to his home on the evening of the murder, his confession to Varden that he had struck Macedonio in the head, restrained, and robbed him, and his attempt to enlist Varden's help to kidnap and eliminate Gabriel as a witness to the murder.  At one point during his testimony, Varden even left the stand and demonstrated for the jury Call's description of how he had restrained Macedonio and left him to die in the cornfield, including raising his right foot off of the floor to demonstrate how Call had "hog-tied" Macedonio to keep him from running.  In stark contrast to this live account of Varden's encounters with Call and his first-hand account of Call's brutal treatment of Macedonio and Gabriel, Agent Cabe related the general substance of Varden's testimony by reading from his notes in an obviously dry, rote fashion, and often in sentence fragments.

23

Clearly, the state's decision to present the substance of Varden's statements in this fashion did not afford Call's counsel the opportunity to repeat the live cross-examination of Varden that it had conducted during the guilt phase. And it is perhaps true, as is now argued by Call, that Agent Cabe's position in law enforcement might have provided some cloak of validity to Varden's story. However, we cannot overlook the fact that trial counsel had already attempted and failed to paint Varden as an uncharged accomplice and unreliable witness before a jury, and that trial counsel was free at any time to resubmit their cross-examination of Varden in the resentencing proceeding, albeit at the risk that Varden's direct testimony would be read into the record as well or that the state might then decide to call Varden as a witness. By allowing the substance of Varden's prior testimony to come in via a second-hand account of Agent Cabe and conducting a "strong and effective" cross-examination of the latter, trial counsel was able to bring out the points on cross-examination necessary to create doubt in the validity of Varden's statements without the problem of Varden testifying and repeating live the testimony that was so damning at the guilt phase. As the state MAR court pointed out, "[t]rial counsel's cross-examination of Agent Cabe regarding Varden's statement was effective" but "without the risk of denials by Varden." J.A. 341. And, like the state court, we find it significant that Call's trial counsel had this "prior opportunity

24

to cross-examine Alan Varden," but "made no attempt to call Varden as a witness or to introduce his prior sworn testimony." J.A. 341.

We are also unpersuaded by Call's reliance upon trial counsel's after-the-fact affidavits concerning their strategies, or lack thereof, regarding Varden's statements. Call's lead attorney, Mr. Lynch, filed an affidavit professing no strategic reason for failing to object to Agent Cabe's testimony. Lynch provided no elaboration regarding his thought process in this regard, however, nor did he offer an opinion regarding whether he felt that the decision, in hindsight, was a poor or otherwise deficient one. In contrast, Call's second-chair counsel, Mr. Willey, filed an affidavit in support of Call's MAR that was substantially more self-critical.[6] According to Mr. Willey, counsel felt that the state had made an inadequate showing that Gabriel was unavailable as a witness, but "made a strategic decision not to ask for a continuance because we believed that bringing [Gabriel] or the father of the victim into the courtroom would not have helped our client's case." J.A. 270. In contrast, Willey asserted that they "believed that having Alan Varden in the courtroom would have helped our case," but "did not object . . . because of the long-standing holding of the North Carolina Supreme Court that the North Carolina Rules of Evidence do not apply to capital sentencing

---

[6]Lynch was very ill when he executed his affidavit and passed away several months later. Willey executed his affidavit shortly thereafter.

hearings." J.A. 270-71. Unlike Lynch, Willey leads the court to believe that he at least was simply unaware that he could object to Agent Cabe's hearsay testimony under the Confrontation Clause or otherwise, and he implies that such failure should be deemed constitutionally deficient performance on their part. Having considered the respective affidavits, we find little utility in the representations of either counsel.

First, it is well-settled that the test of Strickland performance is an objective one; Call was required to demonstrate that his "counsel's representation fell below an objective standard of reasonableness" measured by "prevailing professional norms." Strickland, 466 U.S. at 688 (emphasis added).

In all such cases,

> [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Id. at 689 (citation omitted). We can discern no good reason to apply a different standard to self-scrutiny by defense counsel of their own assistance. Hindsight within the clarity of defeat fosters such second-guessing and self-criticism, particularly on the part of competent professionals who take seriously their

26

obligation to zealously represent clients charged with capital crimes. The objective test for constitutionally ineffective assistance of counsel under the Sixth Amendment accounts for this understandable tendency and keeps our focus not on what could have been done differently, but on whether what was done was constitutionally effective representation. For the reasons set forth above, the state court's determination that the performance of Call's trial counsel was constitutionally effective is objectively reasonable.

Second, we cannot overlook the fact that trial counsel, despite Willey's statements in his affidavit, appear to have been aware that North Carolina applied Confrontation Clause protections in capital sentencing proceedings at the time of Call's resentencing. In fact, trial counsel objected to the introduction of Gabriel's testimony, presented a lengthy argument regarding the propriety of introducing the testimony under both the North Carolina Rules of Evidence and the Confrontation Clause, and engaged the trial court in a specific discussion of the McLaughlin case and its evidentiary and Confrontation Clause issues. Thus, the objective record indicates that counsel made a conscious decision to object to the reading of the hearsay testimony of Gabriel (who was in Mexico) but not to object to the hearsay testimony of Agent Cabe and risk having Varden brought in to testify in person. And, even if counsel had believed they had no

27

valid objection to Agent Cabe's testimony, they nonetheless made the decision not to pursue the presentation of Varden's testimony via the reading of his prior testimony (as was done with Gabriel) or to present him live themselves. The fact that Call's counsel had available the testimony to refute any contradictory evidence, did not do so, and professed no impediment to doing so, is strong evidence that they were satisfied with the dry second-hand account of Varden's testimony and were pleased to have Varden and Gabriel, arguably the two most damaging witnesses, both absent from the resentencing proceeding.

3.

To conclude, the state court found that trial counsel were not ineffective because any objection under the Confrontation Clause would have been futile and, in any event, counsel's failure to object was neither deficient performance nor prejudicial to Call under the circumstances. We cannot say that either determination was an unreasonable one. It is not clear that North Carolina would have considered Agent Cabe's testimony, presented as it was in a capital resentencing proceeding, to be a violation of the Confrontation Clause. And, in any event, we do not think it deficient performance for defense counsel to choose not to object to materials or testimony that presents the substance of damaging evidence in a more innocuous fashion. Here, Call has failed to meet his burden of demonstrating that an objectively reasonable

28

attorney would have objected to Agent Cabe's testimony and, while not required to do so, the state has made a strong showing that an objectively reasonable attorney would have followed the exact path counsel did here.

B.

For largely the same reasons, the state court's rejection of Call's ineffective assistance of appellate counsel claim was also not an unreasonable application of Supreme Court precedents governing such claims. The state court rejected this claim on the merits, noting that Call's appellate counsel "filed an extensive, well researched brief, raising numerous valid assignments of error" and could not be found ineffective based upon an issue that was without merit and that would have been unsuccessful on appeal.

In addition, the state court held that Call failed to demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. As noted by the state court, the aggravating circumstances in this case were strongly supported by the details provided by Gabriel, Dr. Sporn, and the other witnesses to the gruesome crime scene. And, because Call's counsel chose not to object to Agent Cabe's testimony, there was simply no need for the state to introduce the recorded testimony of Varden, which all agree could have been admitted by the state court, or to call him as a live witness. As a strategic matter, it might have

29

presented a stronger case for the state, but as a substantive matter, the evidence had been presented and there was no need to present cumulative evidence of Varden's statements. Had Call's counsel objected to Agent Cabe's testimony, and that objection been sustained by the trial court, the state would have been presented with two options: it could have called Varden as a live witness to reiterate the testimony he gave during the guilt phase or it could have asked to have Varden's prior testimony read to the jury. The substance of the evidence would have remained the same. And, even if appellate counsel had raised a Confrontation Clause issue on appeal, the appellate court would likely have found no plain error. Accordingly, we also cannot say that the state court's rejection of Call's ineffective assistance of appellate counsel claim was contrary to or an unreasonable application of clearly established Supreme Court precedents governing such claims.

## IV.

For the foregoing reasons, we affirm the district court's denial of Call's petition for writ of habeas corpus.

<u>AFFIRMED</u>